1 | ROBBINS UMEDA & FINK LLP
BRIAN J. ROBBINS (190264)
2 | MARC M. UMEDA (197847)
STEVEN J. SIMERLEIN (156979)
3 | 610 West Ash Street, Suite 1800
San Diego, CA 92101
4 | Telephone: 619/525-3990
Facsimile: 619/525-3991
5 | brobbins@ruflaw.com
mumeda@ruflaw.com
6 | ssimerlein@ruflaw.com

7 | Attorneys for Plaintiff Carolyn Adduci

**FILED**

SEP – 5 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-Filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HRL

CAROLYN ADDUCI, Derivatively on Behalf of BLUE COAT SYSTEMS, INC.,

Plaintiff,

vs.

BRIAN M. NESMITH, MICHAEL A. MALCOLM, DAVID A. DE SIMONE, ROBERT P. VERHEECKE, ALAN L. ROBIN, JAMES A. BARTH, DAVID W. HANNA, JAY W. SHIVELY, III, TIMOTHY HOWES, ANDREW S. RACHLEFF, STUART G. PHILLIPS, MARC L. ANDREESSEN, and PHILIP J. KOEN,

Defendants,

– and –

BLUE COAT SYSTEMS, INC., a Delaware corporation,

Nominal Defendant.

No. 06   5453

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE SARBANES OXLEY ACT OF 2002, SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, RESCISSION, ACCOUNTING AND CONSTRUCTIVE TRUST

DEMAND FOR JURY TRIAL

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Blue Coat Corporation ("Blue Coat" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of federal and state law, including the Sarbanes-Oxley Act of 2002, Section 14(a) of the Securities Exchange Act of 1934, breaches of fiduciary duties and unjust enrichment that have caused substantial losses to Blue Coat and other damages, such as to its reputation and goodwill.

2.     Dating back to at least 1999, defendants have caused or allowed Blue Coat insiders to manipulate their stock option grant dates so as to secretly maximize their profits from the stock options. Specifically, certain Blue Coat insiders changed their respective stock option grant dates to take advantage of lower exercise prices than the price on the actual grant date. The price of Blue Coat shares on the reported option-grant date therefore was lower than the share price on the actual day options were issued. This provided the insiders with more favorably priced options than they were entitled to. Defendants' backdating practices yielded stock option grants to the Company's insiders which, along with improper accounting, contributed to defendants' ability to sell over $91.3 million worth of their Blue Coat stock.

3.     Further, the backdating of these stock options brought an instant paper gain to these insiders because the options were priced below the stock's fair market value when they were actually awarded. Under Generally Accepted Accounting Principles ("GAAP"), this instant paper gain was equivalent to paying extra compensation and was thus a cost to Blue Coat. These costs were also not properly recorded. In turn, since these costs were not properly recorded, Blue Coat's profits were overstated. Thus, a restatement of Blue Coat's past financial results will be necessary to correct for these improprieties.

4.     In addition to breaches of fiduciary duty and accounting issues, the backdating of stock options can have severe tax consequences. While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment. In effect, backdating allows these "in-the-money" options to appear in regulatory filings as if they were ordinary grants. For example, for performance-based stock options (generally granted to the five

- 1 -

1   highest-paid executives), a company is allowed to take a tax deduction on that full amount *provided*

2   *that the options were granted at the market price*.  Backdating, however, automatically disqualifies

3   those options from receiving the tax break—instead, a company's tax deduction would be capped at

4   $1 million for each of the top five executives.

5       5.      In a recent article published by *The Wall Street Journal*, Arthur Levitt, a former

6   chairman of the U.S. Securities and Exchange Commission ("SEC") was quoted as stating that stock

7   option backdating "*represents the ultimate in greed*[.]"  Further, Levitt stated, "[*i*]*t is stealing, in*

8   *effect.  It is ripping off shareholders in an unconscionable way*."

9       6.      On May 5, 2006, President George W. Bush stated in an interview on the Kudlow &

10  Company show airing on CNBC that "overcompensating or trying to backdate things is bad for

11  America, and there ought to be consequences when people don't tell the truth and are not

12  transparent."

13      7.      On July 14, 2006, defendants shocked the market when they caused the Company to

14  announce that certain of the Company's stock options appear to have been misdated.  In part,

15  Defendants disclosed:

16      [The Company] announced today that it is currently conducting a voluntary review of its
        historical practices in granting stock options to members of senior management and
17      employees of the Company. Blue Coat has filed a Form 12b-25 with the Securities and
        Exchange Commission stating that it will be unable to file timely an annual report on
18      Form 10-K for the fiscal year ended April 30, 2006 until this review has been completed.

19
        The Company's Board of Directors has appointed a committee of independent
20      directors to conduct this review. The committee is being assisted by independent legal
        counsel and accounting experts. The review covers all option grants since the Company's
21      initial public offering in November 1999. The independent committee has also advised
        the Company's independent registered public accounting firm, Ernst & Young LLP, of its
22      review.

23
        *The independent committee has reached a preliminary conclusion that the*
24      *actual measurement dates for financial accounting purposes of certain stock option*
        *grants issued in the past likely differ from the recorded grant dates of such awards*. The
25      independent committee has not completed its investigation and is continuing its review of
        these matters. Based on the preliminary conclusions of the independent committee, the
26      Company believes it may record additional non-cash charges for stock-based
        compensation expense, but is not yet able to determine the amount of such charges or the
27      resulting tax impact of these actions. The Company similarly is not yet able to determine

28

- 2 -

whether any such compensation charges would be material and require the Company to restate previously issued financial statements.

*In light of the ongoing review, the Company stated that it is withdrawing its previously-issued financial outlook for the first fiscal quarter of 2006 (ending July 31, 2006), and that it expects to incur significant legal and professional fees in this quarter.*

8. On August 3, 2006, defendants caused the Company to issue a press release which announced that its common stock was subject to de-listing by NASDAQ because they had not timely filed the Company's Annual Report on Form 10-K for 2005. In this same release, Defendants announced that the SEC had launched an informal inquiry into the stock option practices at Blue Coat.

9. As a result of the defendants' improprieties, the Company will need to expend significant sums of money including the following:

(a)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)     costs incurred from increased Directors and Officer's Insurance ("D&O Insurance") premiums as a result of the illegally manipulated stock option grants;

(c)     enormous tax liabilities from improper deductions taken on backdated option grants;

(d)     costs incurred from directing manpower to correct Blue Coat's defective internal controls; and

(e)     costs incurred from directing manpower to potentially restate Blue Coat's prior financial results to correct for the improperly dated stock option grants.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331 in that plaintiff's claims arise in part under the Constitution and laws of the United States, including the Sarbanes-Oxley Act of 2002. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11. This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

12. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this Complaint, including the defendants' primary participation in the wrongful acts detailed herein, aiding and abetting, and conspiracy in violation of fiduciary duties owed to Blue Coat, occurred in substantial part in this District. Finally, defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

13. Plaintiff Carolyn Adduci is, and was at times relevant hereto, an owner and holder of Blue Coat stock. Plaintiff is a citizen of Massachusetts.

14. Nominal Defendant Blue Coat (f/k/a Cacheflow, Inc.) is a Delaware corporation with its principal executive offices located at 650 Almanor Avenue, Sunnyvale, California. According to its public filings, Blue Coat provides proxy appliances related to the visibility and control of internet communications.

15. Defendant Brian M. NeSmith ("NeSmith") has served as President, Chief Executive Officer ("CEO") and a director of the Company since March 1999. Because of NeSmith's positions, he knew or should have known that Blue Coat executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the past three years, Blue Coat paid defendant NeSmith the following compensation:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Defendant | Fiscal Year | Salary | Stock Options |
|-----------|-------------|--------|---------------|
| NeSmith | 2005 | $250,000 | 0 |
| | 2004 | $135,000 | 50,000 |
| | 2003 | $20,000 | 100,000 |

Defendant NeSmith is a citizen of California.

16.     Defendant Michael A. Malcolm ("Malcolm") was Chairman and a director of Blue Coat from 1996 until November 2000. Because of Malcolm's positions, he knew or should have known that Blue Coat executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Malcolm is a citizen of California.

17.     Defendant David A. de Simone ("de Simone") has served as Senior Vice President of Engineering at Blue Coat since September 2003. Because of de Simone's position, he knew or should have known that Blue Coat executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the past two years, Blue Coat paid defendant de Simone the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options |
|-----------|-------------|--------|-------|---------------|
| de Simone | 2005 | $250,000 | $137,500 | 0 |
| | 2004 | $164,904 | $13,545 | 180,000 |

Defendant de Simone is a citizen of California.

18.     Defendant Robert P. Verheecke ("Verheecke") was Blue Coat's Senior Vice President, Chief Financial Officer, and Secretary from May 2001 until May 2005. Because of Verheecke's position, he knew or should have known that Blue Coat executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information

- 5 -

provided to him in connection therewith. During the past three years, Blue Coat paid defendant Verheecke the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options |
|-----------|-------------|----------|----------|---------------|
| Verheecke | 2005 | $250,000 | $18,125 | 0 |
| | 2004 | $250,000 | $20,625 | 40,000 |
| | 2003 | $250,000 | $18,750 | 50,000 |

Defendant Verheecke is a citizen of California.

19. Defendant Alan L. Robin ("Robin") served as the Company's Senior Vice President, Worldwide Sales from 1999 until April 2002. Because of Robin's position, he knew or should have known that Blue Coat executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Between 2000 and 2002, Blue Coat paid defendant Robin the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options |
|-----------|-------------|----------|----------|---------------|
| Robin | 2002 | $390,384 | $117,997 | 150,0000 |
| | 2001 | $200,000 | $169,259 | 0 |
| | 2000 | $115,385 | $471,523 | 622,000 |

Defendant Robin is a citizen of California.

20. Defendant James A. Barth ("Barth") is a Blue Coat director and has been since January 2005. Because of Barth's positions, he knew or should have known that Blue Coat executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Barth is a citizen of California.

21. Defendant David W. Hanna ("Hanna") is a Blue Coat director and has been since October 1996. Hanna is also Blue Coat's Chairman of the Board of Directors (the "Board") and has been since February 2001. From December 1998 to March 1999, Hanna also served as the Company's Interim President and Chief Executive Officer. Because of Hanna's positions, he knew or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   should have known that Blue Coat executives were improperly backdating stock option grants to

2   maximize their personal profits, via access to internal corporate documents, conversations and

3   connections with other corporate officers and employees, attendance at management and Board

4   meetings and committees thereof and via reports and other information provided to him in

5   connection therewith. Defendant Hanna is a citizen of California.

6          22.    Defendant Jay W. Shiveley, III ("Shiveley") is a Blue Coat director and has been

7   since May 2004. Because of Shiveley's positions, he knew or should have known that Blue Coat

8   executives were improperly backdating stock option grants to maximize their personal profits, via

9   access to internal corporate documents, conversations and connections with other corporate officers

10  and employees, attendance at management and Board meetings and committees thereof and via

11  reports and other information provided to him in connection therewith. As a member of the Audit

12  and Governance and Nominating Committees, defendant Shiveley caused or allowed the

13  dissemination of improper financial statements that failed to account for defendants' undisclosed

14  stock option compensation and controlled the other Defendants' stock option awards described

15  herein. Defendant Shiveley is a citizen of California.

16         23.    Defendant Timothy Howes ("Howes") is a Blue Coat director and has been since

17  2005. Because of Howes' positions, he knew or should have known that Blue Coat executives were

18  improperly backdating stock option grants to maximize their personal profits, via access to internal

19  corporate documents, conversations and connections with other corporate officers and employees,

20  attendance at management and Board meetings and committees thereof and via reports and other

21  information provided to him in connection therewith. Defendant Howes is a citizen of California.

22         24.    Defendant Andrew S. Rachleff ("Rachleff") was a director of Blue Coat from October

23  1997 until September 2005. Because of Rachleff's position, he knew or should have known that

24  Blue Coat executives were improperly backdating stock option grants to maximize their personal

25  profits, via access to internal corporate documents, conversations and connections with other

26  corporate officers and employees, attendance at management and Board meetings and committees

27  thereof and via reports and other information provided to him in connection therewith. Defendant

28  Rachleff is a citizen of California.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1        25.     Defendant Stuart G. Phillips ("Phillips") was a director of Blue Coat from 2000 to

2 approximately June 2001. Because of Phillips' position, he knew or should have known that Blue

3 Coat executives were improperly backdating stock option grants to maximize their personal profits,

4 via access to internal corporate documents, conversations and connections with other corporate

5 officers and employees, attendance at management and Board meetings and committees thereof and

6 via reports and other information provided to him in connection therewith. As a member of the

7 Audit Committee, defendant Phillips additionally caused or allowed the dissemination of improper

8 financial statements that failed to account for defendants' undisclosed stock option compensation.

9 Defendant Phillips is a citizen of California.

10        26.     Defendant Marc Andreessen ("Andreessen") was a director of Blue Coat from

11 October 1999 to September 2005. Because of Andreessen's position, he knew or should have known

12 that Blue Coat executives were improperly backdating stock option grants to maximize their

13 personal profits, via access to internal corporate documents, conversations and connections with

14 other corporate officers and employees, attendance at management and Board meetings and

15 committees thereof and via reports and other information provided to him in connection therewith.

16 Defendant Andreessen is a citizen of California.

17        27.     Defendant Philip J. Koen ("Koen") was a director of Blue Coat from 2001 until

18 August 2003. Because of Koen's position, he knew or should have known that Blue Coat executives

19 were improperly backdating stock option grants to maximize their personal profits, via access to

20 internal corporate documents, conversations and connections with other corporate officers and

21 employees, attendance at management and Board meetings and committees thereof and via reports

22 and other information provided to him in connection therewith. As a member of the Audit

23 Committee and Compensation Committee, defendant Koen additionally caused or allowed the

24 dissemination of improper financial statements that failed to account for defendants' undisclosed

25 stock option compensation. Defendant Koen is a citizen of Texas.

26        28.     The defendants identified in ¶¶15, 16, 20-27 are referred to herein as the "Director

27 Defendants." The defendants identified in ¶¶15-19 are referred to herein as the "Officer

28 Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein

1 | as the "Individual Defendants." Defendants NeSmith, Barth, Hanna, de Simone, Verheecke, Robin

2 | and Phillips are all alleged to have received backdated and/or otherwise manipulated stock options

3 | and they shall be referred to herein as the "Option Defendants."

### DEFENDANTS' DUTIES

5 | 29. Each of the Defendants owed the Company and Blue Coat shareholders the duty to

6 | exercise a high degree of care, loyalty and diligence in the management and administration of the

7 | affairs of the Company, as well as in the use and preservation of its property and assets. The conduct

8 | of Defendants complained of herein involves knowing, intentional and culpable violations of their

9 | obligations as officers and directors of Blue Coat. Further, the misconduct of Blue Coat's officers

10 | has been ratified by Blue Coat's Board, which has failed to take any legal action on behalf of the

11 | Company against them.

12 | 30. By reason of their positions as officers, directors and fiduciaries of Blue Coat and

13 | because of their ability to control the business and corporate affairs of the Company, Defendants

14 | owed Blue Coat and its shareholders fiduciary obligations of candor, trust, loyalty and care, and

15 | were required to use their ability to control and manage Blue Coat in a fair, just, honest and equitable

16 | manner, and to act in furtherance of the best interests of Blue Coat and its shareholders so as to

17 | benefit all shareholders equally and not in furtherance of their personal interest or benefit. In

18 | addition, as officers and/or directors of a publicly held company, the Defendants had a duty to

19 | refrain from utilizing their control over Blue Coat to divert assets to themselves via improper and/or

20 | unlawful practices. Defendants also had a duty to promptly disseminate accurate and truthful

21 | information with respect to the Company's operations, earnings and compensation practices.

22 | 31. Because of their positions of control and authority as directors or officers of Blue

23 | Coat, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts

24 | complained of herein. These acts include: (i) agreement to and/or acquiescence in Defendants'

25 | option backdating scheme; (ii) willingness to cause Blue Coat to disseminate false financial

26 | statements for 2000-2005, which failed to disclose Defendants' option backdating scheme and

27 | omitted the fact that certain of the Company's officers and directors were allowed to backdate their

28 | stock option grants in order to manipulate the strike price of the stock options they received.

- 9 -

1  Because of their positions with Blue Coat, each of the Defendants was aware of these wrongful acts,

2  had access to adverse non-public information and was required to disclose these facts promptly and

3  accurately to Blue Coat shareholders and the financial markets but failed to do so.

4        32.    Between 2000 and 2005, as reported in the Company's Annual Proxies, Defendants

5  repeated that the stock option grants made during that period carried an exercise price that was not

6  less than the fair market value of Blue Coat stock on the date granted, as calculated by the public

7  trading price of the stock at the market's close on that date. However, Defendants concealed until

8  July 2006 that the stock option grants were repeatedly and consciously backdated to ensure that the

9  strike price associated with the option grants was at or near the lowest trading price for that fiscal

10  period.[1] Due to Defendants' breach of their fiduciary duty in the administration of the stock option

11  plans, plaintiff seeks to have the directors' and officers' plans voided and gains from those plans

12  returned to the Company. In the alternative, plaintiff seeks to have all of the unexercised options

13  granted to defendants between 2000 and 2005 cancelled, the financial gains obtained via the exercise

14  of such options returned to the Company and to have Defendants revise the Company's financial

15  statements to reflect the truth concerning these option grants.

16        33.    To discharge their duties, the directors of Blue Coat were required to exercise

17  reasonable and prudent supervision over the management, policies, practices and controls of the

18  business and financial affairs of Blue Coat. By virtue of such duties, the officers and directors of

19  Blue Coat were required, among other things, to:

20        (a)    manage, conduct, supervise and direct the business affairs of Blue Coat in

21  accordance with all applicable law;

22        (b)    neither engage in self-dealing nor knowingly permit any officer, director or

23  employee of Blue Coat to engage in self-dealing;

24        (c)    neither violate nor knowingly permit any officer, director or employee of Blue

25  Coat to violate applicable laws, rules and regulations;

26

27  [1]  Blue Coat's fiscal year ends on April 30.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(d)     remain informed as to the status of Blue Coat's operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable law;

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)     establish and maintain systematic and accurate records and reports of the business and affairs of Blue Coat and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Blue Coat's financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)     exercise control and supervision over the public statements to the securities markets and trading in Blue Coat stock by the officers and employees of Blue Coat; and

(i)     supervise the preparation and filing of any financial reports or other information required by law from Blue Coat and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Blue Coat and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

34.     Each Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of

- 11 -

1 herein involves a knowing and culpable violation of their obligations as directors and/or officers of

2 Blue Coat, the absence of good faith on their part, and a reckless disregard for their duties to the

3 Company and its shareholders which Defendants were aware or should have been aware posed a risk

4 of serious injury to the Company.  The conduct of the Defendants who were also officers and/or

5 directors of the Company during the relevant period has been ratified by the remaining Defendants

6 who comprised Blue Coat's entire Board during the relevant period.

7      35.    Defendants breached their duties of loyalty and good faith by allowing or by

8 themselves causing the Company to misrepresent its financial results and prospects, as detailed

9 herein infra, and by failing to prevent the Defendants from taking such illegal actions.  In addition,

10 as a result of Defendants' illegal actions and course of conduct during the relevant period, the

11 Company is now the subject of an SEC investigation.  As a result, Blue Coat has expended and will

12 continue to expend significant sums of money.  Such expenditures include, but are not limited to:

13         (a)    improvidently paid executive compensation;

14         (b)    increased capital costs as a result of the loss of market capitalization and the

15 Company's damaged reputation in the investment community;

16         (c)    costs incurred to carry out internal investigations, including legal fees paid to

17 outside counsel; and

18         (d)    incurring possible IRS penalties for improperly reporting compensation.

19      36.    These actions have irreparably damaged Blue Coat's corporate image and goodwill.

20 For at least the foreseeable future, Blue Coat will suffer from what is known as the "liar's discount,"

21 a term applied to the stocks of companies who have been implicated in illegal behavior and have

22 misled the investing public, such that Blue Coat's ability to raise equity capital or debt on favorable

23 terms in the future is now impaired.

24                **AIDING AND ABETTING AND CONCERTED ACTION**

25      37.    In committing the wrongful acts alleged herein, Defendants have pursued or joined in

26 the pursuit of a common course of conduct and acted in concert with one another in furtherance of

27 their common plan.

28

38.     During all times relevant hereto, Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert millions of dollars to Blue Coat insiders and directors and causing Blue Coat to misrepresent its financial results; (ii) maintain Defendants' executive and directorial positions at Blue Coat and the profits, power and prestige which Defendants enjoyed as a result of these positions; (iii) deceive the investing public, including shareholders of Blue Coat, regarding Defendants' compensation practices and Blue Coat's financial performance.

39.     The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, and to conceal adverse information concerning the Company's operational and financial condition.

40.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent Blue Coat's financial results. Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

41.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

42.     Stock options give recipients the chance to purchase a Company's common stock at a certain price, which is usually referred to as the "strike price." Generally, option strike prices are set on the date of the grant and they are established based on the corporation's closing stock price on the date of the grant.

43.     Generally, the theory is that the recipient of any option grant is assuming the risk in receiving the grant; that is, if the corporation's stock price declines after the date of the grant, those

- 13 -

1 options are said to "underwater" because they are not "in the money" and thus, there is no rationale

2 economic reason to exercise the option.

3      44.    Conversely, if a corporation's stock price increases after the date of a grant, the

4 recipient of the grant has received a valuable economic benefit - the recipient can then exercise the

5 option, which allows him/her to purchase stock below market price which he/she can then sell into

6 the market for a profit.

7      45.    In 2005, the SEC began investigating the stock option granting practices of numerous

8 companies. As reported by the Wall Street Journal (the "Journal ") on March 18, 2006, the SEC's

9 "look at options timing was largely prompted by academic research that examined thousands of

10 companies and found odd patterns of stock movement around the dates of the grants."

11      46.    The premise of the academic research was that mere chance could not have accounted

12 for many of the fortuitous grant dates and a pattern emerged - at certain companies, executives,

13 consistently, over a multi-year period, received options that were purportedly dated at or near

14 historical low trading prices of their companies' stock, but just before material increases in the stock

15 price. Generally, the theory is that these improper backdating practices allowed executives to reap

16 unlawful windfalls profits when the options were exercised. It stands to reason - if an executive was

17 allowed to pick a strike date (instead of sticking with whatever date the options were actually

18 awarded), he/she could pick a date when corporation's stock price was low, thereby earning "extra",

19 but illicit profits.

20      47.    In its March 18th story, the Journal, employing a sophisticated financial analysis,

21 identified a number of companies where it appeared as though the grant dates were not random, and

22 it speculated that executives at these companies had received backdated stock options.

23      48.    In the wake of the Journal story, there have been more than 50 investigations

24 commenced related to the backdating of options for numerous executives at some of the nation's

25 largest companies.

26      49.    Throughout the relevant period, Defendants caused Blue Coat to grant them

27 thousands of stock options permitting them to buy Blue Coat stock for pennies on the dollar which

28 they could in turn sell as the Company's stock price increased. Plaintiff alleges that a number of

1  these grants were improperly backdated, which in turn caused the Company's relevant period

2  financial statements to be false and misleading when issued.

3  **STOCK OPTION GRANTS AT BLUE COAT**

4      50.  Certain of Blue Coat's manipulative stock option grants are described below:

5  **2005 Option Grants**

6      51.  According to the Company's Annual Proxy Statement: on January 14, 2005, Barth

7  was granted 17,500 options at a strike price of $19.09 per share.  The price of the Company's

8  common stock increased more than 34% in the ten trading days following this grant.

9  **2003 Option Grants**

10      52.  According to the Company's Annual Proxy Statement dated August 26, 2004, de

11  Simone was granted 180,000 options at a strike price of $8.04 per share on September 2, 2003. The

12  price of the Company's common stock increased more than 50% in the ten trading days following

13  this grant.

14  **2002 Option Grants**

15      53.  According to the Company's Annual Proxy Statement dated August 26, 2003,

16  NeSmith and Verheecke were granted 150,000 options at a strike price of $2.25 per share on July 10,

17  2002. The price of the Company's common stock increased more than 8% in the ten trading days

18  following this grant.

19  **2001 Option Grants**

20      54.  According to the Company's Annual Proxy Statement dated August 6, 2002,

21  Verheecke and Robin received 650,000 options at a strike price of $3.35 per share on July 30, 2001.

22  The Company's common stock price increased more than 41% in the ten trading says following the

23  grant.

24  **2000 Option Grants**

25      55.  According to the Company's Annual Proxy Statement dated July 17, 2001, Hanna,

26  Phillips and Rachleff received 15,000 options at a strike price of $105.00 per share on August 30,

27

28

- 15 -

1   2000. The price of the Company's common stock increased more than 14% in the ten trading days

2   following this grant.

3       56.     Based on the material increases in the Company's stock price following the purported

4   grant dates detailed above, plaintiff alleges on information and belief that these options were

5   backdated or otherwise manipulated.

6       57.     Complicating matters and magnifying the harm to Blue Coat, during the relevant

7   period, Blue Coat's internal controls and accounting controls with respect to option grants and

8   exercises, and its financial reporting, were grossly inadequate. The weaknesses allowed dates of

9   both grants and exercises to be manipulated and the Company's executive compensation expenses to

10  be materially understated. They also allowed grant dates to be changed to provide executives with

11  more favorably priced options, in effect augmenting their compensation, with no benefit running to

12  the Company.

13      58.     Through their fiduciary duties of care, good faith and loyalty, Defendants owed to

14  Blue Coat a duty to ensure that the Company's financial reporting fairly presented, in all material

15  respects, the operations and financial condition of the Company.   In order to adequately carry out

16  these duties, it is necessary for the Defendants to know and understand the material non-public

17  information to be either disclosed or omitted from the Company's public statements. This material

18  non-public information included the problems Blue Coat faced because of its deficient internal

19  controls. Furthermore, certain of those Defendants who served as members of the Audit Committee

20  at any point during the relevant period had a special duty to know and understand this material

21  information as set out in the Audit Committee's charter, which provides that the Audit Committee is

22  responsible for reviewing, in conjunction with management, the Company's policies generally with

23  respect to the Company's earnings press releases and with respect to financial information and

24  earnings guidance provided to analysts and rating agencies.  Those Defendants who served as

25  officers of Blue Coat had ample opportunity to discuss this material information with their fellow

26  officers at management meetings and via internal corporate documents and reports. Moreover, those

27  Defendants who served as directors of Blue Coat had ample opportunity to discuss this material

28  information with fellow directors at any of the scores of Board meetings that occurred during the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  relevant period as well as at committee meetings of the Board. Despite these duties, Defendants

2  negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the

3  misleading statements to be disseminated by Blue Coat to the investing public and the Company's

4  shareholders during the relevant period.

5       59.    Specifically, since at least 1999, Defendants have caused Blue Coat to report false

6  and misleading fiscal and quarterly financial results which materially understated its compensation

7  expenses and thus overstated its earnings.

8       60.    In effect, during the relevant period, the Defendants caused Blue Coat's shares to

9  trade at artificially inflated levels by issuing a series of materially false and misleading statements

10  regarding the Company's financial statements, business and prospects. Specifically, Defendants

11  caused or allowed Blue Coat to issue statements that failed to disclose or misstated the following: (i)

12  that the Company had problems with its internal controls that prevented it from issuing accurate

13  financial reports and projections; (ii) that because of improperly recorded stock-based compensation

14  expenses the Company's financial results violated GAAP; and (iii) that the Company's public

15  disclosures presented an inflated view of Blue Coat's earnings.

16            **THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT
ON BLUE COAT'S FINANCIAL STATEMENTS**

17

**The Fiscal 2000 Form 10-K**

18

19       61.    On or about July 28, 2000, Defendants caused the Company to file its fiscal 2000

20  Form 10-K with the SEC. The fiscal 2000 Form 10-K was simultaneously distributed to

shareholders and the public. The fiscal 2000 Form 10-K included Blue Coat's fiscal 2000 financial

21

statements which were materially false and misleading and presented in violation of GAAP, due to

22

its improper accounting for the backdated stock options. As a result, Blue Coat's compensation

23

expense was understated and its net earnings were overstated.

24

**The Fiscal 2001 Form 10-K**

25

26       62.    On or about July 16, 2001, Defendants caused the Company to file its fiscal 2001

Form 10-K with the SEC. The fiscal 2001 Form 10-K was simultaneously distributed to

27

shareholders and the public. The fiscal 2001 Form 10-K included Blue Coat's fiscal 2001 financial

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    statements which were materially false and misleading and presented in violation of GAAP, due to

2    its improper accounting for the backdated stock options.  As a result, Blue Coat's compensation

3    expense was understated and its net earnings were overstated.

**The Fiscal 2002 Form 10-K**

5        63.     On or about July 29, 2002, Defendants caused the Company to file its fiscal 2002

6    Form 10-K with the SEC.  The fiscal 2002 Form 10-K was simultaneously distributed to

7    shareholders and the public.  The fiscal 2002 Form 10-K included Blue Coat's fiscal 2002 financial

8    statements which were materially false and misleading and presented in violation of GAAP, due to

9    its improper accounting for the backdated stock options.  As a result, Blue Coat's compensation

10    expense was understated and its net earnings were overstated.

**The Fiscal 2003 Form 10-K**

12        64.     On or about July 29, 2003, Defendants caused the Company to file its fiscal 2003

13    Form 10-K with the SEC.  The fiscal 2003 Form 10-K was simultaneously distributed to

14    shareholders and the public.  The fiscal 2003 Form 10-K included Blue Coat's fiscal 2003 financial

15    statements which were materially false and misleading and presented in violation of GAAP, due to

16    its improper accounting for the backdated stock options.  As a result, Blue Coat's compensation

17    expense was understated and its net earnings were overstated.

**The Fiscal 2004 Form 10-K**

19        65.     On or about July 14, 2004, Defendants caused the Company to file its fiscal 2004

20    Form 10-K with the SEC.  The fiscal 2004 Form 10-K was simultaneously distributed to

21    shareholders and the public.  The fiscal 2004 Form 10-K included Blue Coat's fiscal 2004 financial

22    statements which were materially false and misleading and presented in violation of GAAP, due to

23    its improper accounting for the backdated stock options.  As a result, Blue Coat's compensation

24    expense was understated and its net earnings were overstated.

**The Fiscal 2005 Form 10-K**

26        66.     On or about July 14, 2005, Defendants caused the Company to file its fiscal 2005

27    Form 10-K with the SEC.  The fiscal 2005 Form 10-K was simultaneously distributed to

28    shareholders and the public.  The fiscal 2005 Form 10-K included Blue Coat's fiscal 2005 financial

1   statements which were materially false and misleading and presented in violation of GAAP, due to

2   its improper accounting for the backdated stock options. As a result, Blue Coat's compensation

3   expense was understated and its net earnings were overstated.

4       67.    The materially false and misleading fiscal 2000-2005 Form 10-Ks described above

5   were reviewed, prepared, endorsed and/or signed by the Defendants.

6   **DEFENDANTS' SCHEME BEGINS TO UNRAVEL**

7       68.    On July 14, 2006, Defendants shocked the market when they caused the Company to

8   announce that certain of the Company's stock options appear to have been misdated. In part,

9   Defendants disclosed:

> [The Company] announced today that it is currently conducting a voluntary review of
> its historical practices in granting stock options to members of senior management
> and employees of the Company. Blue Coat has filed a Form 12b-25 with the
> Securities and Exchange Commission stating that it will be unable to file timely an
> annual report on Form 10-K for the fiscal year ended April 30, 2006 until this review
> has been completed.
>
> The Company's Board of Directors has appointed a committee of independent
> directors to conduct this review. The committee is being assisted by independent
> legal counsel and accounting experts. The review covers all option grants since the
> Company's initial public offering in November 1999. The independent committee has
> also advised the Company's independent registered public accounting firm, Ernst &
> Young LLP, of its review.
>
> *The independent committee has reached a preliminary conclusion that the
> actual measurement dates for financial accounting purposes of certain stock
> option grants issued in the past likely differ from the recorded grant dates of such
> awards.* The independent committee has not completed its investigation and is
> continuing its review of these matters. Based on the preliminary conclusions of the
> independent committee, the Company believes it may record additional non-cash
> charges for stock-based compensation expense, but is not yet able to determine the
> amount of such charges or the resulting tax impact of these actions. The Company
> similarly is not yet able to determine whether any such compensation charges would
> be material and require the Company to restate previously issued financial
> statements.
>
> *In light of the ongoing review, the Company stated that it is withdrawing its
> previously-issued financial outlook for the first fiscal quarter of 2006 (ending July
> 31, 2006), and that it expects to incur significant legal and professional fees in this
> quarter.*

    69.    The price of the Company's common stock declined more than 6% on this news.

- 19 -

1     70.     On August 3, 2006, Defendants caused the Company to issue a press release which

2 announced that its common stock was subject to de-listing by NASDAQ because they had not timely

3 filed the Company's Annual Report on Form 10-K for 2005. In this same release, Defendants

4 announced that the SEC had launched an informal inquiry into the stock option practices at Blue

5 Coat.

6     71.     This option scheme has damaged, and will continue to damage Blue Coat.

7           **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

8     72.     Plaintiff brings this action derivatively in the right and for the benefit of Blue Coat to

9 redress injuries suffered, and to be suffered, by Blue Coat as a direct result of the breaches of

10 fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust

11 enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Blue Coat is

12 named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer

13 jurisdiction on this Court that it would not otherwise have.

14     73.     Plaintiff will adequately and fairly represent the interests of Blue Coat in enforcing

15 and prosecuting its rights.

16     74.     Plaintiff is and was an owner of the stock of Blue Coat during times relevant to the

17 Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the

18 Company.

19     75.     The current Board of Blue Coat consists of the following six individuals: defendants

20 Barth, Hanna, NeSmith, Shiveley and Howes and Keith B. Geeslin ("Geeslin"). Plaintiff has not

21 made any demand on the present Board of Blue Coat to institute this action because such a demand

22 would be a futile, wasteful and useless act.

23     76.     The Board is responsible for approving the compensation awarded to Blue Coat's

24 executive officers. This compensation includes the stock options that were secretly backdated by

25 Blue Coat insiders. Therefore, the entire Board is liable for failing to fulfill its fiduciary duties to

26 Blue Coat in approving the option grants as dated. The Board should have properly informed itself

27 of the circumstances surrounding the options granted to Blue Coat's insiders before approving them.

28 Indeed, these options were routinely approved by the Board when they were dated at the Company's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   lowest closing price for the respective month in which the options were granted establishing that

2   these decisions were not informed. Accordingly, there is reason to doubt that defendants Barth,

3   Hanna, NeSmith, Shiveley and Howes are disinterested because they face sufficiently substantial

4   liability for their breaches of fiduciary duty to Blue Coat. The Board's decision to approve the

5   options was not the product of valid business judgment. Thus, demand is futile as to defendants

6   Barth, Hanna, NeSmith, Shiveley and Howes.

7          77.    The Compensation Committee of the Board is specifically responsible under its

8   charter for reviewing and approving grants of stock options and other equity awards to Blue Coat

9   insiders. This responsibility, although held by the Board, is delegated to the Compensation

10  Committee. The Compensation Committee is comprised of defendants Barth and Hanna. Defendant

11  Hanna has been a Compensation Committee member for over ten years. These defendants were

12  responsible as members of the Compensation Committee to review and grant stock options granted

13  to Blue Coat insiders during their respective tenures on the committee. Clearly, these defendants did

14  not fulfill this duty because they did not act to inform themselves of the circumstances surrounding

15  these option grants, thereby causing or allowing the Company's insiders to obtain unreasonable and

16  unreported compensation via the backdating of stock option grants. Accordingly, there is a

17  reasonable doubt that defendants Barth and Hanna are disinterested because they face sufficiently

18  substantial liability for their breaches of fiduciary duty to Blue Coat. The Compensation

19  Committee's decision to approve the options was not the product of valid business judgment. Thus,

20  demand is futile as to defendants Barth and Hanna.

21         78.    The Audit Committee of the Board is responsible by its charter for: (i) reviewing and

22  discussing Blue Coat's annual and quarterly financial statements; (ii) discussing earnings press

23  releases and financial information and earnings guidance provided to analysts and rating agencies;

24  (iii) reviewing Blue Coat's significant accounting and reporting principles, policies and practices;

25  and (iv) reviewing Blue Coat's management information systems, internal accounting and financial

26  controls. The Audit Committee is comprised of defendants Barth, Hanna and Shiveley. Defendant

27  Hanna was a member of the Audit Committee for over ten years. These defendants were responsible

28  as members of the Audit Committee for insuring that Blue Coat's internal controls were adequate

- 21 -

1  and that the Company's quarterly and annual financial statements were accurate. Blue Coat's internal

2  controls, however, were deficient as evidenced by its insiders' improper backdating of stock option

3  grants. As a result of the improper option backdating, the Company's financials were rendered

4  inaccurate because those financials did not account for the true amount of compensation being

5  granted to Blue Coat's insiders. Accordingly, there is a reasonable doubt that defendants Barth,

6  Hanna and Shiveley are disinterested because they face sufficiently substantial liability for their

7  breaches of fiduciary duty to Blue Coat. Thus, demand is futile as to defendants Barth, Hanna and

8  Shiveley.

9       79.   The principal professional occupation of defendant NeSmith is his employment with

10  Blue Coat, pursuant to which he received and continues to receive substantial monetary

11  compensations and other benefits. Specifically, defendant NeSmith was paid the following

12  compensation during the past three years:

| Defendant | Fiscal Year | Salary | Stock Options |
|-----------|-------------|--------|---------------|
| NeSmith | 2005 | $250,000 | 0 |
| | 2004 | $135,000 | 50,000 |
| | 2003 | $20,000 | 100,000 |

Accordingly, defendant NeSmith lacks independence from defendants Barth and Hanna, defendants

who are not disinterested and/or independent and who exert influence over defendant NeSmith's

compensation by virtue of their positions as members of the Compensation Committee. The

Compensation Committee has the authority to review and approve NeSmith's base salary, bonus and

equity compensation. This lack of independence renders defendant NeSmith incapable of

impartially considering a demand to commence and vigorously prosecute this action.

      80.   Defendants Hanna, Barth and NeSmith are liable to Blue Coat for the undeserved

compensation that they received as a result of the stock options that they backdated or otherwise

manipulated. Accordingly, there is a reasonable doubt that defendants Hanna, Barth and NeSmith

are disinterested because they face a sufficiently substantial liability to Blue Coat in connection with

their improperly dated Blue Coat stock options. Thus, demand is futile as to defendants Hanna,

Barth and NeSmith.

- 22 -

81.     The entire Blue Coat Board and senior management participated in the wrongs complained of herein.  Blue Coat's directors are not disinterested or independent due to the following: defendants Barth, Hanna, NeSmith, Shiveley and Howes served on the Blue Coat Board during the period in which Company executives were improperly backdating their stock option grants. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above referenced defendants breached the fiduciary duties that they owed to Blue Coat and its shareholders in that they failed to prevent and correct the improper stock option backdating practices.  Thus, the Blue Coat Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Blue Coat to damages in the form of costs that the Company must expend to restate its past financials and to investigate defendants' improprieties.

82.     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

83.     The Director Defendants of Blue Coat, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Blue Coat's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

84.     In order to bring this suit, all of the directors of Blue Coat would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

85.     The acts complained of constitute violations of the fiduciary duties owed by Blue Coat's officers and directors and these acts are incapable of ratification.

86.     Blue Coat has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Blue Coat any part of the damages Blue Coat suffered and will suffer thereby.

87.    If Blue Coat's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Blue Coat. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Blue Coat against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Blue Coat, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Blue Coat to sue them, since they will face a large uninsured liability.

88.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Blue Coat for any of the wrongdoing alleged by plaintiff herein.

89.    Plaintiff has not made any demand on shareholders of Blue Coat to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Blue Coat is a publicly held company with over 14.4 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT I

### Against Defendants NeSmith and Verheecke for Disgorgement
### under the Sarbanes-Oxley Act of 2002

90.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91.    Section 304 of the Sarbanes-Oxley Act of 2002 provides that if a public company prepares an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's chief executive officer and chief financial officer must reimburse the company for certain payments made by the company to those executives.  Section 304, entitled "Forfeiture of Certain Bonuses and Profits," provides in full:

(a)    **Additional compensation prior to noncompliance with commission financial reporting requirements**.  If an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, *the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for –*

1.    any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

2.    any profits realized from the sale of securities of the issuer during that 12-month period.

(b)    **Commission exemption authority**.  The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

92.    Blue Coat will restate its financial statements filed from 1999 to the present due to the material non-compliance of such statements with federal securities laws reporting requirements. These restatements resulted from "misconduct" within the meaning of Section 304 of the Sarbanes-Oxley Act of 2002.  As a result, defendant NeSmith, as Blue Coat's CEO and defendant Verheecke as Blue Coat's Chief Financial Officer are required to reimburse Blue Coat for all bonuses or other incentive-based or equity-based compensation received by them from the Company during the period July 30, 2002 (the date of enactment of the Sarbanes-Oxley Act of 2002) through the present.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Further, defendants NeSmith and Verheecke also are liable to Blue Coat for any profits realized from

2    the sales of securities by the Company during that same period of time.

3         93.    Defendants NeSmith and Verheecke are also liable to plaintiff for reasonable costs

4    and attorneys' fees in the prosecution of this derivative action on behalf of Blue Coat.

5                                         **COUNT II**

6    **Against Defendants NeSmith, Andreessen, Hanna, Malcolm, Phillips and Rachleff for
     Violation of Section 14(a) of the Exchange Act**

7

8         94.    Plaintiff incorporates by reference and realleges each and every allegation set forth

     above, as though fully set forth herein.

9

10        95.    The Individual Defendants issued, caused to be issued and participated in the

11   issuance of materially false and misleading written statements to shareholders which were contained

     in the Company's proxy statement issued on August 4, 2000. The August 4, 2000 Proxy (the "2000

12

     Proxy") contained a proposal to Blue Coat's shareholders that they vote to approve an amendment to

13

14   the Company's 1999 Stock Incentive Plan, which provides for grants of stock options to Blue Coat's

     executives and directors. One of the proposed amendments was to increase the plan's share reserve

15

16   by two million shares. The 2000 Proxy, however, misrepresented and failed to disclose that the

     Company's executives were engaged in the improper backdating or manipulation of stock options

17

     and that the Board was approving those options as dated. By reasons of the conduct alleged herein,

18

19   defendants NeSmith, Andreessen, Hanna, Malcolm, Phillips and Rachleff, who were directors that

     caused or allowed the issuance of this proxy statement, violated §14(a) of the Exchange Act. As a

20

21   direct and proximate result of the Director Defendants' wrongful conduct, Blue Coat misled and/or

     deceived its shareholders by falsely portraying how the 1999 Stock Incentive Plan would be

22

23   administrated.

24        96.    This information would have been material to Blue Coat's shareholders in

25   determining whether or not to approve the proposed amendment of the 1999 Stock Incentive Plan

     contained in the 2000 Proxy.

26

27        97.    Plaintiff, on behalf of Blue Coat, thereby seeks relief for damages inflicted upon

28   the Company in connection with the improper approval of the 1999 Stock Incentive Plan amendment

                                          - 26 -
                   VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  based upon the misleading and incomplete proxy materials. Plaintiff, on behalf of Blue Coat, also

2  seek a disgorgement of the compensation paid to the Individual Defendants in connection with the

3  1999 Stock Incentive Plan amendment described in the 2000 Proxy.

### COUNT III

**Against the Option Defendants for Breach of Fiduciary Duty and Unjust Enrichment**

98.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.   All of the Option Defendants received stock options which are alleged to have been improperly backdated.

100.   Because they received backdated stock options, the Option Defendants were unjustly enriched at the Company's expense.

101.   To remedy the Option Defendants' unjust enrichment, the Court should void the improperly dated options.

### COUNT IV

**Against The Officer Defendants For Breach of Fiduciary Duty and Unjust Enrichment**

102.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.   All of the Officer Defendants received valuable financial benefits during the Relevant Period, including, but not limited to, salaries, bonuses, and stock option grants which were based on *inter alia*, the Company's purported performance as reflected in the Company's financial statements. Because the Individual Defendants did not properly account for the backdated options, the Company's financial statements did not comply with GAAP, and thus, the Company's financial statements were materially overstated and misleading at all times hereto. In sum, the Company's purported performance was false because the Company's financial statements did not accurately reflect the Company's true operating condition. Thus, the Officer Defendants were unjustly enriched by their receipt of these valuable financial benefits which were based on illegally obtained results, as

- 27 -

1 alleged herein, and it would be unconscionable to allow them to retain the benefits of their improper

2 conduct.

3     104.   To remedy the Officer Defendants' unjust enrichment, the Court should order them to

4 disgorge to the Company all other monetary benefits derived from the option scheme.

5 **COUNT V**

6 **Against the Individual Defendants For Breach of Fiduciary Duty in Connection with Their**

7 **Management of Blue Coat**

8     105.   Plaintiff incorporates by reference and realleges each and every allegation set forth

9 above, as though fully set forth herein.

10     106.   As alleged in detail herein, each of the Individual Defendants (and particularly the

11 directors on the Compensation and Audit Committees) had a duty to, *inter alia*, exercise good faith

12 to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed

13 on notice of improper or imprudent conduct by the Company and/or its employees, exercise good

14 faith in taking action to correct the misconduct and prevent its recurrence.

15     107.   As alleged in detail herein, the Individual Defendants knew or should have known of

16 the stock option scheme, and they failed to remedy this problem, which has caused disastrous

17 consequences for the Company and its stockholders. Thus, the Individual Defendants breached their

18 fiduciary duty of good faith.

19     108.   All of the Individual Defendants (and particularly the directors on the Audit

20 Committee) willfully ignored the obvious and pervasive problems with Blue Coat's accounting and

21 internal control practices and procedures and made no true effort to correct the problems or prevent

22 their recurrence. Thus, the Individual Defendants abdicated their fiduciary duty of good faith, which

23 could not have been the exercise of valid business judgment.

24     109.   As a direct and proximate result of the Individual Defendants' foregoing breaches of

25 fiduciary duties, the Company has suffered significant damages, as alleged herein.

26

27

28

- 28 -

## COUNT VI

### Against All of the Individual Defendants for Disseminating False and Misleading Information

110. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111. As alleged in detail herein, each of the Individual Defendants (and particularly the directors on the Audit Committee) had a duty to ensure that Blue Coat disseminated accurate, truthful and complete information to the market.

112. Each of the Individual Defendants violated the fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to the market materially misleading and inaccurate information through public statements, including, but not limited to, press releases and SEC filings, as detailed herein.

113. Additionally, each of the Individual Defendants failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's legitimate corporate interests.

114. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT VII

### Against all of the Individual Defendants for Failing to Design and Implement a System of Adequate Internal Controls

115. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116. As alleged in herein, each of the Individual Defendants (and particularly the directors on the Audit Committee) had a duty to Blue Coat and its shareholders to design and implement adequate internal controls, including accounting controls. Further, each of the Individual Defendants (and particularly the directors on the Audit Committee) were required to ensure the Company's financial results were recorded in compliance with GAAP.

- 29 -

117.   Throughout the Relevant Period, the Individual Defendants repeatedly told Company shareholders that they had complied with their fiduciary duties in this regard, but those statements were untrue.   The Company lacked the most basic controls which could have prevented the option scheme (or, at minimum, detected it sooner) and the resulting material negative impact on the Company's financial statements.

118.   Thus, notwithstanding their statements to the contrary, the Individual Defendants abdicated their responsibility to establish and maintain adequate internal controls at Blue Coat, having made no good faith effort to fulfill their fiduciary duties.

119.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT VIII

### Against All Defendants for an Accounting

120.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

121.   At all relevant times, the defendants, as directors and/or officers of Blue Coat, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

122.   In breach of their fiduciary duties owed to Blue Coat and its shareholders, the defendants authorized the granting of backdated Blue Coat stock options to themselves and/or certain other Blue Coat insiders. By this wrongdoing, the defendants breached their fiduciary duties owed to Blue Coat and its shareholders.

123.   The defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the defendants.

124.   As a result of defendants' misconduct, Blue Coat has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

125.   Plaintiff demands an accounting be made of all stock options grants made to defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value

- 30 -

1  of the grants, the recipients of the grants, the exercise date of stock options granted to the defendants,

2  as well as the disposition of any proceeds received by the defendants via sale or other exercise of

3  backdated stock option grants received by the defendants.

### COUNT IX

#### Against the Officer Defendants for Rescission

6      126.    Plaintiff incorporates by reference and realleges each and every allegation contained

7  above as though fully set forth herein.

8      127.    As a result of the acts alleged herein, the stock option contracts between the Officer

9  Defendants and Blue Coat entered into during the relevant period were obtained through defendants'

10  breaches of fiduciary duties, unjust enrichment, gross mismanagement and abuse of control.  Further,

11  the backdated stock options were illegal grants and thus invalid because defendants authorized these

12  options in breach of the terms of the publicly filed contracts regarding the Officer Defendants'

13  employment agreements and the Company's stock option plans, which were also approved by Blue

14  Coat shareholders and filed with the SEC.

15      128.    All contracts which provide for stock option grants between the Officer Defendants

16  and Blue Coat and were entered into during times relevant hereto should, therefore, be rescinded,

17  with all sums paid under such contracts returned to the Company, and all such executory contracts

18  cancelled and declared void.

### COUNT X

#### Against All Defendants for Constructive Trust

21      129.    Plaintiff incorporates by reference and realleges each and every allegation contained

22  above as though fully set forth herein.

23      130.    As a result of the acts alleged herein, defendants authorized the grant of backdated or

24  otherwise manipulated equity based compensation to themselves and other Blue Coat insiders.  In

25  effect, these backdated options and other manipulated equity or incentive based compensation

26  constitutes illegal compensation in violation of Blue Coat's stock option plans, employment contracts

27  and other compensation polices.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

131.    The Company has a right for the return of this compensation because it was illegally authorized by the defendants and paid out of the Company's assets.

132.    Defendants and other Blue Coat insiders profited from the illegally backdated options by wrongful acts.

133.    Accordingly, plaintiff seeks a declaratory judgment that the illicit stock options, and all proceeds derived from exercise thereof and any assets or other property acquired in connection therewith, are and have been held in constructive trust for the company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Declaring that defendants NeSmith and Verheeke are liable under §302 of the Sarbanes-Oxley Act of 2002, and requiring them to reimburse Blue Coat for all bonuses or other incentive based or equity based compensation received by them during the period in which Blue Coat will restate its financial results;

C.    Declaring and decreeing that defendants NeSmith, Andreessen, Hanna, Malcolm, Phillips and Rachleff caused the Company to act in violation of §14(a) of the Exchange Act;

D.    Directing Blue Coat to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Blue Coat and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- 32 -

2.    a proposal to ensure that all stock options granted to executive and non-executive employees are properly awarded, valued and administered;

3.    control and limit insider stock selling;

4.    a provision to permit the shareholders of Blue Coat to nominate at least three candidates for election to the Board; and

5.    appropriately test and then strengthen the internal audit and control functions.

E.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding or otherwise restricting the proceeds of defendants' trading activities, backdated stock options or their other assets so as to assure that plaintiff on behalf of Blue Coat has an effective remedy;

F.    Directing an accounting of all undisclosed backdated stock options granted, directing that all the unexercised options granted to defendants between 2000 and the present be cancelled, ordering the financial gains obtained via the exercise of such stock options returned to the Company, and ordering Blue Coat revise the Company's financial statements to reflect the truth concerning these option grants;

G.    Declaring that defendants' illicit stock options, and all proceeds derived from the exercise thereof, and any assets or other property acquired in connection therewith, are and have been held in constructive trust by defendants for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation;

H.    Awarding to Blue Coat restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants through the improper backdating of stock option grants;

I.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J.    Granting such other and further relief as the Court deems just and proper.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury.

3

DATED: September 5, 2006

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
STEVEN J. SIMERLEIN

4

5

6

BRIAN J. ROBBINS

7

8

610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone :619/525-3990
Facsimile: 619/525-3991

9

10

Attorneys for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 34 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

2         Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3    named parties, there is no such interest to report.

4

5

6    ATTORNEY OF RECORD FOR
     PLAINTIFF CAROLYN ADDUCI
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

<u>VERIFICATION</u>

I, BRIAN J. ROBBINS, hereby declare as follows:

1.      I am a member of the law firm of Robbins Umeda & Fink, LLP, one of the counsel for plaintiff in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 5th day of September, 2006, at San Diego, California.

BRIAN J. ROBBINS